UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

WILLIAM G. SUTHERLAND,

        Plaintiff,

v.                              Case No. 2:13-cv-68
                              HON. ROBERT HOLMES BELL

BADAWI ABDELLATIFF, et al.,

        Defendants.

_____/

## REPORT AND RECOMMENDATION

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. On July 24, 2013, this Court ordered service of Plaintiff's complaint on Defendants Wendy Ball, Rae-Ann Brand, Michael. L. Brostoski, M. Fears, Unknown Filuppa, B. Haynie, Tamerson Hodges, Cornell Howard, Unknown Jones, Unknown Konieczki, Patricia Lamb, Byron Osborn, T. Swift, S. Thompson, W. Wade, Ester Ward, Jeffrey Woods, Melissa LaPlaunt, and G. Covert.[1]

In Plaintiff's amended complaint, he alleges a long history of medical maladies. As noted by the Court in the June 27, 2013, opinion denying Plaintiff's motion for a temporary restraining order:

> In his *pro se* amended complaint and his motion, Plaintiff describes all of his medical ailments. First, Plaintiff contends that he has a cracked jaw with only three bottom teeth and damaged gums that leaves him unable to chew and digest food. Plaintiff states that he ate his last meal on October 31, 2011. Apparently, a doctor fractured his jaw in 1990 while performing surgery on Plaintiff. Plaintiff learned of the fracture in 2008. Because Plaintiff is concerned that his jaw might move out of place, which causes him to gag and spit up in front

---

[1] It was noted in the Order for Service that the Court lacks sufficient information to order service on Nurse Unknown Party #1. Docket #8 at 1. Defendants Fears, Haynie, Howard, Jones and Wade have not been served.

of other prisoners, he requested a meal-in accommodation from Defendant Brostoski but was denied.  (Am. Compl., docket #3, Page ID#46.)

Plaintiff also complains that Defendant Brostoski requires him to use a walker, which is allegedly destroying Plaintiff's right shoulder, straining his lower back and causing the palms of his hands to blister. In January 2001, Plaintiff tore his right rotator cuff in his shoulder and it was repaired by a surgeon.  In March 2002, Plaintiff re-injured his shoulder by falling off a bridge.  Plaintiff was then informed by multiple doctors that his right shoulder was inoperable and Plaintiff would eventually need a plastic shoulder.  Plaintiff further alleges that the walker is straining "two ruptured discs" in his back that were diagnosed in 2004.  (Mot., docket #4, Page ID#70.)

Moreover, Plaintiff argues that he has been denied nerve medication, which is causing him pain in his left leg and foot.  Plaintiff finally states that a large ceiling fan in his cell is blowing cold air directly on him, causing pain and swelling in his left leg.

*See* docket #5, at 1-2.

Plaintiff asserts numerous claims against Defendants.  Plaintiff claims that Defendant LaPlaunt removed the footrests to Plaintiff's wheelchair.  Defendant Brostoski denied necessary medication, surgical procedures, and accommodation requests.  Defendant Ball refused treatment for a toe injury.  Defendant Osborn failed to adequately address an assault on Plaintiff by Plaintiff's cellmate, and provided false information that caused Plaintiff to be improperly medically cleared to be moved.  Defendant Thompson forced Plaintiff to move about without a wheelchair, and placed him in a bunk that allowed cold air to blow directly on his injured leg.  Defendant Brand improperly cleared Plaintiff to walk with a walker, which caused Plaintiff further injuries.  Defendant Covert denied Plaintiff's grievance against health services for the injuries caused by his use of a walker. Defendant Filuppa retaliated against Plaintiff by verbally assaulting him, yelling obscenities, and conspiring with Defendant Jones.  Defendant Jones retaliated against Plaintiff by calling Plaintiff to the officers desk three times in one hour to get mail when Defendant Jones knew about Plaintiff's

2

medical conditions, and conspiring with Defendant Filuppa. Defendant Ward held a retaliatory administrative hearing and decided to charge Plaintiff a co-pay for health care services without Plaintiff's presence at the hearing in violation of Plaintiff's due process rights. Defendant Ward also injured Plaintiff by slamming his cell door and causing it to strike Plaintiff on his elbow, and improperly changed Plaintiff's disbursement request from $40 to $90. Defendant Hodges falsified a document in retaliation. Defendant Swift and Defendant Osborn agreed not to remove Plaintiff's cellmate, failing to protect Plaintiff from known harm. Defendant Woods failed to notify the CFA director or designee of Plaintiff's medical details, which caused Plaintiff to be subjected to cruel and unusual punishment in violation of the ADA. Defendant Woods also failed to remove Plaintiff's cellmate after notification of assault. Defendant Konieczki had Plaintiff moved to a new cell in retaliation for Plaintiff's complaints against staff. Defendant Unknown Party #1 (Jane Doe #1) conspired with Defendant Ball to deny treatment for Plaintiff's toe injury. Defendant Howard retaliated against Plaintiff by accepting false responses during a grievance investigation and moving Plaintiff to an area requiring the use of an elevator that aggravated Plaintiff's medical conditions. Defendant Wade failed to contact state police to investigate an assault on Plaintiff by Defendant Ward. Defendant Fears falsified a document in retaliation. Finally, Defendant Haynie violated policy 05.01.140 regarding prisoner placement and transfer by failing to ensure Plaintiff's medical priorities and details were documented on the transfer.

On January 14, 2014, Defendants Brostoski and Brand filed a motion for summary judgment (docket #37) on the grounds that Plaintiff failed to exhaust administrative remedies and that Defendants were not deliberately indifferent to Plaintiff's medical condition. Plaintiff filed a response (docket #58) on March 13, 2014. Defendants filed a reply (docket #66) on March 24, 2014. Plaintiff filed a final response (docket #71) on April 11, 2014. On January 28, 2014, Defendants

3

Ball, Covert, Filuppa, Hodges, Konieczki, LaPlaunt, Lamb, Osborn, Swift, Thompson, Ward and Woods filed a motion for summary judgment (docket #44) on the grounds that Plaintiff failed to allege sufficient facts for a retaliation claim, Plaintiff failed to establish the elements of an Eighth Amendment claim for deliberate indifference and use of excessive force, some Defendants lack personal involvement, Plaintiff was provided sufficient accommodations for his disability, Defendants are entitled to qualified immunity, and the Court should decline to assert supplemental jurisdiction over state claims. Plaintiff filed a response (docket #63) on March 17, 2014. Defendants' motions for summary judgment are ready for decision.

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005); *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)); *see also Tucker v. Union of Needletrades Indus. & Textile Employees*, 407 F.3d 784, 787 (6th Cir. 2005). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

Defendants Brostoski and Brand claim that they are entitled to summary judgment because Plaintiff failed to exhaust his available administrative remedies. A prisoner's failure to

exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove. *Jones v. Bock*, 127 S. Ct. 910, 919-21 (2007). A prisoner cannot file a claim in court "until such administrative remedies as are available are exhausted." 42 U.S.C.A. § 1997e(a). A prisoner's failure to exhaust his administrative remedies prior to filing suit is an affirmative defense for which defendants have the burden to plead and prove. *Jones v. Bock*, 540 U.S. 199, 212-216; 127 S.Ct. 910, 919-21 (2007). The failure to exhaust "must be established by the defendants." *Surles v. Andison*, 678 F.3d 452, 455 (2012) (quoting *Napier v. Laurel County, Ky.*, 636 F.3d 218, 225 (6th Cir.2011)).

A moving party without the burden of proof need show only that the opponent cannot sustain his burden at trial. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). A moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). "Where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The United States Court of Appeals for the Sixth Circuit repeatedly has emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000); *Cockrel*, 270 F.2d at 1056 (same). Accordingly, summary judgment in favor of the party with the burden of persuasion

"is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Pursuant to the applicable portion of the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust his available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001). A prisoner must first exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000); *Freeman v. Francis*, 196 F.3d 641, 643 (6th Cir. 1999). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones v. Bock*, 127 S. Ct. 910, 922-23 (2007); *Woodford v. Ngo*, 126 S. Ct. 2378, 2386 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 127 S. Ct. at 922-23.

MDOC Policy Directive 03.02.130 (effective July 9, 2007), sets forth the applicable grievance procedures for prisoners in MDOC custody at the time relevant to this complaint. Inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control *Id.* at ¶ P. If oral resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted oral resolution. *Id.* at ¶ P. The Policy Directive also provides the following directions for completing grievance forms: "The issues shall be stated briefly. Information provided shall be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those

6

involved in the issue being grieved are to be included." *Id.* at ¶ R (emphasis in original).  The inmate

submits the grievance to a designated grievance coordinator, who assigns it to a respondent.  *Id.* at

¶ X.

       If the inmate is dissatisfied with the Step I response, or does not receive a timely

response, he may appeal to Step II by obtaining an appeal form within ten business days of the

response, or if no response was received, within ten days after the response was due.  *Id.* at ¶¶ T, DD.

The respondent at Step II is designated by the policy, *e.g.,* the regional health administrator for a

medical care grievances.  *Id.* at ¶ GG.  If the inmate is still dissatisfied with the Step II response, or

does not receive a timely Step II response, he may appeal to Step III.  *Id.* at ¶ FF.  The Step III form

shall be sent within ten business days after receiving the Step II response, or if no Step II response

was received, within ten business days after the date the Step II response was due.  *Id.* at ¶ FF.  The

Grievance and Appeals Section is the respondent for Step III grievances on behalf of the MDOC

director.  *Id.* at ¶ GG.  Time limitations shall be adhered to by the inmate and  staff at all steps of the

grievance process.  *Id.* at ¶ X.   "The total grievance process from the point of filing a Step I

grievance to providing a Step III response shall be completed within 90 calendar days unless an

extension has been approved . . .."  *Id* at ¶ HH.

       A review of the grievance record reveals that Plaintiff has filed numerous grievances

while in prison.  *See* docket #38-1.  Plaintiff filed grievance URF-13-01-0250-28c on Defendant

Brand, asserting that she improperly had Plaintiff placed under a ceiling fan, which blew cold air on

his swollen left knee, causing Plaintiff to suffer severe pain.  In addition, the grievance asserted that

Defendant Brand's decision to make Plaintiff use a walker caused further damage to his left

shoulder, as well as nerve damage to his left hand and finger.  *See* docket #38-1, p. 11.  As noted by

Defendant Brand, grievance number URF-13-01-0250-28c was rejected at each level for stating

multiple issues in violation of MDOC grievance procedures. Defendant Brand contends that, therefore, Plaintiff failed to exhaust his claims against her.

In addressing a similar situation, the Sixth Circuit Court held that whether the grievance contains multiple grievances or one grievance may be determined by how one reads the grievance. *LaFountain v. Martin*, 334 Fed. Appx. 738, 741 (6th Cir. 2009) (footnote 2).

> On June 29, 2004, LaFountain filed Grievance No. MCF 04-07-00444-28BC ("No.444"), raising two claims: (1) that Martin retaliated against him for having filed grievances by telling other prisoners that he was a snitch and a sexual predator; and (2) that lack of supervision over Martin by the MCF warden, deputy warden, and assistant deputy warden, as well as their failure to train Martin, resulted in LaFountain's cell being robbed. This grievance was rejected because it raised multiple claims. Pursuant to Michigan Department of Corrections ("MDOC") Policy Directive 03.02.130(G)(1), a grievance may be rejected if it contains "multiple unrelated issues, or raises issues that are duplicative of those raised in another grievance filed by the grievant." LaFountain thereafter filed two new grievances-Grievance Nos. MCF 04-07-00472-28A ("No.472") and MCF 04-07-00471-28A ("No.471")-in which he separated his claims against Martin and the others. Both grievances were rejected as being duplicative on No. 444, and LaFountain unsuccessfully appealed both to Step III of the grievance process. The Step III investigator concluded that No. 471 was duplicative of No. 444 and that No. 472 contained multiple unrelated issues.
>
> At issue here is only whether LaFountain's claim against Martin, as pursued administratively through No. 472, was properly exhausted.
>
> Upon review, we find that LaFountain properly exhausted his First Amendment retaliation claim against Martin which, pursuant to his pleadings, can also be construed as a deliberate indifference claim under the Eighth Amendment. *See Farmer v. Brennan,* 511 U.S. 825, 833-35, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *see also Benefield v. McDowall,* 241 F.3d 1267, 1271 (10th Cir.2001) ("labeling an inmate a snitch satisfies the *Farmer* standard and constitutes deliberate indifference to the safety of that inmate.") We find, as a matter of law,[FN2] that No. 472 does not raise multiple unrelated issues, as was concluded by the Step III investigator and the district court.[FN3] It raises one claim, namely, that Martin retaliated against LaFountain for having filed grievances by labeling him a snitch and a sexual

8

> predator in order to motivate other prisoners to take hostile action against him. The hostile action that LaFountain claims to have suffered as a result of being labeled a snitch and a sexual predator, such as being accosted in the bathroom and having his cell robbed, is merely the harm he suffered as a result of the alleged retaliation. *See Thaddeus-X v. Blatter,* 175 F.3d 378, 394 (6th Cir.1999).

*LaFountain v. Martin*, 334 Fed. Appx. 738, 740-41 (6th Cir. 2009) (footnotes omitted).

The court concludes that grievance URF-13-01-0250-28c, much like the grievance at issue in *LaFountain*, can be read as containing only one claim – that Defendant Brand acted indifferently by failing to provide adequate medical care to Plaintiff for medical conditions aggravated by the use of the walker prescribed by Defendant Brand.  Docket #38-1 at 11.  The majority of the grievance lists the medical maladies Plaintiff suffers and how the use of the walker aggravated those issues.  *Id.*  Therefore, the court concludes that Plaintiff did properly exhaust his administrative remedies with regard to his claims against Defendant Brand.

However, as noted by Defendant Brostoski, the only grievance in which Plaintiff specifically named him was grievance URF-11-12-4281-12d (12d).  In URF-11-12-4281-12d, Plaintiff asserted that the pain in his right shoulder has been worsened while attempting to enter the elevator in the housing unit, and that his request to be housed in a unit with a ramp was improperly denied by Defendant Brostoski.  *See* Docket #38-2 at 8.  As Defendant Brostoski concedes, this grievance has been exhausted.  *See* Docket 38-2 at 5-9.  There is no indication that Plaintiff filed grievances regarding any of his other claims against Defendant Brostoski.  Therefore, Defendant Brostoski is entitled to summary judgment on those claims for lack of exhaustion.

Moreover, Defendants Brostoski and Brand, as well as Defendants LaPlaunt, Ball, and Thompson, assert that they are entitled to summary judgment on the merits of Plaintiff's Eighth Amendment claims because they did not act with deliberate indifference to any serious medical need.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 102, 103-04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104-05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[ ] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004). If, however the need involves "minor maladies or non-obvious complaints of a serious need for medical care," *Blackmore*, 390 F.3d at 898, the inmate must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (citing *Farmer*, 511 U.S. at 834). Deliberate indifference "entails something more than mere negligence," *Farmer,* 511 U.S. at 835, but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.*

10

Under *Farmer*, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

Not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105-06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Ward v. Smith*, No. 95-6666, 1996 WL 627724, at *1 (6th Cir. Oct. 29, 1996). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Rouster v. Saginaw Cnty.*, No. 13-1673, slip op. at 12 (6th Cir. Apr. 9, 2014); *Perez v. Oakland County*, 466 F.3d 416, 434 (6th Cir. 2006);

*Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell v. Hininger*, No. 13-5315, slip op. at 4-5 (6th Cir. Apr. 4, 2013) (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).

Plaintiff claims that he was moved to URF West in deliberate indifference to his medical needs, specifically his need to use a wheelchair. Defendants Thompson, Covert, Osborn, and LaPlaunt attest that Plaintiff was moved to URF West in order to accommodate an influx of prisoners who were permanently wheelchair bound and that Plaintiff was not the only inmate moved for this reason. *See* Docket#45-10 at 2, Defendant Thompson; #45-11 at 3, Defendant Covert; #45-8 at 3, Defendant Osborn; #45-5 at 3, Defendant LaPlaunt. Additionally, URF West could accommodate Plaintiff's need to use a wheelchair when he was required to travel longer distances, and that Plaintiff was able to use his walker for moving around the unit. Plaintiff's medical needs were also addressed by giving Plaintiff a bottom bunk closest to the bathrooms and lobby area. Docket #45-10 at 3.

Plaintiff claims that Defendants Brostoski and Brand acted with deliberate indifference towards Plaintiff's medical needs. In his affidavit, Defendant Brostoski states:

> My review of [Plaintiff's] medical records, as well as my personal knowledge in treating him, shows that he has a history of chronic back pain and other musculoskeletal complaints for which he has received extensive treatment, including various accommodations at different times such as a cane (issued 7/12/10), a wheelchair for long distances (issued 8/23/11), no lifting more than 10 pounds (issued 7/22/10) and a bottom bunk profile (1/17/07).

12

*See* Docket #37-3, pp. 3-4, ¶ 5.  This assertion is supported by Plaintiff's medical record.  *See* Docket #40-1, p. 22.

Defendant Brostoski first saw Plaintiff on November 3, 2011, at which time he reviewed the accommodations that Plaintiff had arrived with, including his profiles for bottom bunk, extra bedding / air mattress, cane, wheelchair for long distances, athletic shoes, ram use, a prohibition on lifting more than 10 pounds, and a prohibition of any work assignment.  Defendant Brostoski explained that URF medical providers used MDOC guidelines and objective medical information in ordering special accommodations for prisoners in order to be fair and consistent.  *See* Docket #37-3, p. 6, ¶ 11; Docket #40-1, pp. 22-23.

During the appointment, Plaintiff stated that the Attorney General had told him he could have an air mattress, and that he would order his own if necessary.  In addition, with regard to the order that he use a wheelchair for distance, Plaintiff stated that he did not want to use the wheelchair at all, but that his doctor told him that he should not do anything that would add stress to the discs in his back.  Plaintiff complained that sitting at a table causes him to suffer twinges of pain in his left hip and buttock, as well as a flailing reaction in his right arm.  As a result, Plaintiff is afraid that he will throw a drink at his table mate if he is required to eat in the mess hall.  Plaintiff indicated that he was unable to bend over and tie shoes, thus he required velcro shoes.  Finally, with regard to the bottom bunk detail, Defendant Brostoski noted that Plaintiff had cervical spine fusion in 1986.  *See* Docket #37-3, p. 6, ¶ 12; Docket #40-1, p. 23.

Defendant Brostoski examined Plaintiff's left foot, noting that the skin, pulses, and intrinsic foot muscles were intact with normal thickness.  Defendant Brostoski performed a "monofilament test" to assess sensation in Plaintiff's left foot.  Plaintiff reported that sensation was absent, but stated that he could feel Defendant Brostoski run his hand across his foot.  Defendant

13

Brostoski observed that Plaintiff's toe and foot flexion and extension were intact, that his left hip and knee extended stiffly and resisted flexion. However, Plaintiff did achieve 90 degrees of hip flexion while seated and his knee flexion and range of motion were intact. Plaintiff's knee was stable and had no observable atrophy of his left lower extremities. *See* Docket #37-3, p. 7, ¶ 13; Docket #40-1, p. 2.

Defendant Brostoski determined that Plaintiff did not require an air mattress or meals-in accommodations, but approved the athletic shoe accommodation. Defendant Brostoski questioned the necessity of a wheelchair and noted that he would follow up with Plaintiff regarding neurosurgical issues. Defendant Brostoski further noted that Plaintiff's obesity was a major factor in his pain and disability. Defendant Brostoski directed Plaintiff to follow an exercise regimen, reviewed Plaintiff's medications, and ordered a follow-up appointment to further address Plaintiff's medical issues. *See* Docket #37-3, p. 7, ¶ 14; Docket #40-1, pp. 24-25. Defendant Brostoski attests that Plaintiff showed no signs of pressure ulcers and did not meet the MDOC guidelines for an air mattress. In addition, Plaintiff remained physically able to attend meals in the regular dining hall. Docket #37-3, p. 7, ¶¶ 15-16.

On November 15, 2011, Plaintiff was seen by a nurse for calf pain. Plaintiff stated that he needed an air mattress and that he would not go to the chow hall because it hurt too much to sit up and eat. However, it was noted that a correctional officer reported that Plaintiff was observed getting out of his wheelchair and walking to the unit bathroom and in the hallway without difficulty. During the appointment, it was noted that Plaintiff was able to extend his leg and elevate it slightly without any observable distress. Docket #37-3, p. 8, ¶ 17; Docket #40-1, pp. 26-28.

On November 18, 2011, Plaintiff told Defendant Brostoski that he had not eaten because he was afraid that a muscle spasm would cause him to spill something at the prison table

14

and that he would be attacked.  Plaintiff also stated that he felt like he had tin foil in his left shoe and that he had a history of shoulder surgeries and would eventually need a shoulder replacement. Plaintiff showed Defendant Brostoski a letter from the Attorney General, which verified that Plaintiff had a medical detail for an air mattress in November of 2009.  Defendant Brostoski performed a physical examination, which showed that Plaintiff had lost nine pounds in the past ten weeks, and that his weight was 216 pounds.  Plaintiff appeared well hydrated and had normal bowel sounds. In addition, Plaintiff's skin tone, facial features, strength, and muscle function all suggested adequate nutrition.  Plaintiff was able to extend his hip and knee while rolling himself in his wheelchair, his knee and ankle had full range of motion, and his hip range of motion was reduced by pain only to a moderate extent.  During the exam, Plaintiff was able to support his weight using his right arm, and there was no apparent muscle wasting in his right upper extremity.  In addition, Plaintiff was able to achieve moderate range of motion with his right arm.  Defendant Brostoski instructed Plaintiff regarding an exercise program, changed his pain medication to Mobic, and ordered a follow-up appointment.  Defendant Brostoski encouraged Plaintiff to ambulate without the wheelchair for short distances, and informed him that there was no medical necessity for a meals-in accommodation.  Nor did Plaintiff meet the criteria to receive an air mattress.  Docket #37-3, pp. 9-10, ¶¶ 18-21; Docket #40-1, p. 29-31.

On November 29, 2011, Defendant Brostoski saw Plaintiff for complaints of pain and a desire for an air mattress.  Plaintiff stated that Mobic and Tylenol were not effective for his pain. Plaintiff had no swelling in his lower legs and had appropriate pedal pulses.  Plaintiff walked with a cane and kept his left leg extended while sitting, but bent it easily during evaluation.  Plaintiff was issued a wheelchair cushion, and was encouraged to walk with his cane and take his medications as prescribed.  Four days later, Plaintiff complained of pain as a result of twisting in his wheelchair and

from his mattress.  On December 6, 2011, Plaintiff told a nurse that he suffered discomfort as a result of twisting in order to push buttons in the elevator.  Plaintiff requested a ramp or a transfer to another facility.  Plaintiff also stated that he had been urinating blood.  A urinalysis was performed revealing normal results.  Plaintiff was instructed to continue with his exercise program, increase his activity level, and apply warm compresses as needed.  Docket #37-3, pp. 11-12, ¶¶ 24-25; Docket #40-1, pp. 37-42.

Defendant Brostoski saw Plaintiff on December 9, 2011, for a chronic care visit. Plaintiff reported that if he was provided with a ramp, he would be able to use it for exercise because if he walked up and down unit halls, he might be cited for loitering.  A review of Plaintiff's records failed to reveal any rationale for his prior ramp accommodation.  Plaintiff reported burning in his leg and swelling by the end of the day.  Plaintiff also reported for the first time that he had a history of facial bone injury from surgery that made him susceptible to intracranial trauma from being struck in the face and feared that an inmate might hit him if he went to the chow hall, especially if he suffered a spasm and spilled on an inmate.  Defendant Brostoski examined Plaintiff and noted progressive weight loss of 25 pounds over the previous four months, but Plaintiff still appeared well hydrated.  Plaintiff leaned heavily on his cane during the appointment and when he sat on the examination table, he demonstrated antalgia.  However, Plaintiff had full range of motion in his left hip and knee and could flex and extend his back.  Plaintiff used both arms to push himself in his wheelchair, did not have swelling in his left lower extremity, and had minimal sensation.  Defendant Brostoski ordered an attendant to assist Plaintiff at meal time and instructed Plaintiff to elevate his leg when sitting and to keep his skin moisturized.  Defendant Brostoski scheduled Plaintiff for a follow up appointment and made a special notation in Plaintiff's file instructing staff to avoid distraction from Plaintiff's health needs based on his "persistent somatic and social complaints."

Finally, Defendant Brostoski noted that the elevator in Plaintiff's housing unit required minimal effort and that Plaintiff's profile of lifting no more than ten pounds did not prevent him from being able to open or close the elevator doors.  Docket #37-3, pp. 12-13, ¶¶ 26-28; Docket #40-1, pp. 43-45.

On December 14, 2011, Plaintiff refused to go to chow because he feared pain, uncontrolled jerking movements, and the general threat of physical harm.  Because Plaintiff was physically able to go to chow hall for meals, he was not entitled to a meals in accommodation.  On December 20, 2011, Plaintiff was issued a new wheelchair.  Plaintiff had an old accommodation list, which included a footrest.  However, because Plaintiff was able to lift his legs and propel himself in the wheelchair with his feet, he was not entitled to a foot rest.  Defendant Brostoski noted that any removable piece of metal is a potential threat to the safety of staff and inmates in a prison setting, so that such an accommodation will not be granted without a compelling medical indication.  Docket #37-3, pp. 13-14, ¶¶ 29-30; Docket #40-1, pp. 46-49.

On December 24, 2011, Defendant Brostoski discontinued Plaintiff's prescription for Dilantin because of his continued refusal to take the medication.  On January 2, 2012, Plaintiff reported pain in his right shoulder.  Plaintiff was seen by a nurse on January 5, 2012, at which time Plaintiff could raise his arm 30 degrees.  An examination showed no abnormalities in his right shoulder or lower arm.  Plaintiff walked into health services with the assistance of a cane.  The nurse ordered a hot water bottle for Plaintiff and directed him to stand in the elevator instead of using his wheelchair.  On January 6, 2012, Plaintiff stated that he thought he had torn his shoulder and back apart because it hurt him to open the elevator door.  Plaintiff had previously reported a rotator cuff tear in that shoulder.  Defendant Brostoski noted that Plaintiff's complaint was likely motivated by his desire to leave URF as evidenced by his transfer requests.  Defendant Brostoski performed an

examination and noted that the level of Plaintiff's distress seemed exaggerated.  Plaintiff's muscle tone was excellent and he had only mild swelling in his extremities.  Plaintiff's facial bones and mouth appeared normal.  Plaintiff wanted Defendant Brostoski to consider his injuries from a 2011 accident.  Defendant Brostoski advised Plaintiff that he could kite medical records to obtain a release of information in order to get outside records.  Defendant Brostoski told Plaintiff that it was difficult to determine when he was being truthful about his symptoms because he frequently exaggerated his symptoms.  Docket #37-3, pp. 14-16, ¶¶ 31-34; Docket #40-2, pp. 1-11.

Defendant Brostoski renewed Plaintiff's pain medications on March 1, 2012.  On March 8, 2012, Plaintiff told Defendant Brostoski that he could not eat in the dining hall because his dentures were loose and he was unable to chew food, which sometimes caused him to forcefully spit food from his mouth.  Plaintiff's weight had been declining and Defendant Brostoski asked him what would allow him to return to the chow hall.  Plaintiff stated "nothing."  Plaintiff refused a dietary referral and was advised to stop eating snack foods.  Plaintiff also declined any anticonvulsant or other neuromodulating medication for pain unless they were brought to him in his unit.  Defendant Brostoski renewed Plaintiff's prescription for Mobic, encouraged Plaintiff to follow his exercise program, and scheduled a follow-up appointment. Docket #37-3, pp. 16-17, ¶¶ 35-36; Docket #40-2, pp. 20-23.

On April 5, 2012, Plaintiff was seen by Defendant Brand, who issued Plaintiff a walker instead of a cane and a handicap shower detail.  Plaintiff's accommodation for MDOC provided athletic shoes was no longer indicated because Plaintiff did not have any foot deformities or neuropathy, but Plaintiff was advised that he could purchase his own shoes.  Defendant Brand noted that Plaintiff was able to walk short distances and could transfer himself in the wheelchair. Plaintiff appeared to be much more stable on a walker than with a cane, and Defendant Brand praised

his efforts, to which Plaintiff responded that his shoulder was going to act up and that he needed back surgery. Plaintiff was argumentative and threatened legal action throughout the appointment. On May 9, 2012, Plaintiff was again seen by Defendant Brand regarding his weight and nutrition and accepted a referral to a dietician. Plaintiff admitted eating a variety of food from the prison store and Defendant Brand could observe no reason why Plaintiff could not eat in the dining hall. On May 22, 2012, Plaintiff saw a dietician, who recommended that Plaintiff attend chow hall for meals and that he have his weight monitored. Plaintiff refused the dietician's recommendation of a soft mechanical diet. Docket #37-3, p. 17, ¶¶ 37-38; Docket #37-4, pp. 4-5, ¶¶ 6-7, Docket #40-2, pp. 24-30.

Plaintiff was seen by various medical personnel for a variety of complaints on June 13, June 21, July 18, September 14, and October 4, 2012. On July 18, 2012, Defendant Brand saw Plaintiff for chronic shoulder and leg pain. Plaintiff agreed to walk using his walker, but refused to bear weight on his left leg and stated that his shoulder was worse. Plaintiff reported loss of muscle mass in his arms and left leg, in addition to swelling in his left leg. During the appointment, Defendant Brand observed that Plaintiff could bear weight on his left leg to some degree and was able to draw it up onto the exam table without discomfort or difficulty. Although Plaintiff had his right arm close to his body most of the time, Defendant Brand noticed that he could abduct it quite a bit when he believed that he was unobserved. Defendant Brand performed an extensive examination and educated Plaintiff on range of motion and strengthening exercises, as well as the benefits of weight bearing on his left leg. Defendant Brand prescribed Tylenol and Naproxen. Defendant Brand noted that Plaintiff had similar complaints on January 8, 2012, and she reiterated the importance of exercise. Defendant Brand noted that Plaintiff was able to put on his coat without difficulty and weight bear on the right shoulder. Plaintiff was also seen on March 20, 2013, by

19

Joseph B. Damron, R.N., for blisters on his hands from using the walker.  Docket #37-3, p. 17, ¶ 39; Docket #37-4, pp. 4-5, ¶¶ 8-9; Docket #40-2, pp. 32-50; Docket #40-3, pp. 1-5.

On March 26, 2013, Plaintiff was seen by Defendant Brostoski for complaints of right hand and elbow pain, and was requesting wraps for his walker handles.  Defendant Brostoski noted that Plaintiff would not bear any weight on his left foot, but observed no swelling, wasting or mechanical limitation to range of motion in Plaintiff's left knee or ankle.  Defendant Brostoski encouraged Plaintiff to do progressive weight bearing on his left foot, as well as stretching exercises, and showed him how to use his walker in order to avoid excess friction on hands.  On April 23, 2013, Plaintiff complained that he could not stretch as directed because of pain.  Defendant Brostoski noted that Plaintiff was continuing to use his walker without bearing any weight on his left leg, despite the lack of any apparent mechanical limitation to such weight bearing.  Defendant Brostoski noted that his goal in assisting Plaintiff with progressive rehabilitation of his lower extremities was hampered by Plaintiff's lack of cooperation, and the fact that Plaintiff's only goal appeared to be a transfer to another facility.  Docket #37-3, p. 18, ¶¶ 40-41; Docket #40-3, pp. 6-9.

Plaintiff was seen by medical providers several times in June of 2013, for complaints of right shoulder pain, and a skin infection on his palms.  On July 8, 2013, Plaintiff was seen by Dr. Bienvenido Canlas for a chronic care appointment, at which time his condition was essentially unchanged.  Plaintiff's prescriptions were renewed at that appointment.  On July 23, 2013, Dr. Canlas saw Plaintiff for complaints of shoulder pain.  Plaintiff was examined and was directed to continue on his current medications and to do low intensity joint exercises.  On August 15, 2013, Plaintiff's hot water bottle detail was renewed after he stated that he had been using it and that it was helpful to him.  In September of 2013, Plaintiff was seen by Michael G. Brown, R.N., for complaints of blisters on his palms.  Brown instructed Plaintiff that he could bear weight on his left leg, but

Plaintiff responded that he disagreed and would not do it. Plaintiff was not receptive to education and sat with his arms crossed, refusing to make eye contact with Brown. Brown consulted with Defendant Brostoski and ordered that Plaintiff be issued bandaids for self dressing with a nursing evaluation in two weeks. Plaintiff agreed to use the bandaids and to keep the affected area dry and clean. Docket #37-3, p. 19, ¶¶ 42-45; Docket #40-3, pp. 10-29.

Plaintiff's claims in this case are that he received inadequate medical treatment, rather than no treatment at all. As the Sixth Circuit stated in *Westlake*, where "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id*. at 860 n.5. A review of the medical record shows that Plaintiff has received regular treatment for his complaints and that he merely disagrees with the specific treatment provided. Because it is clear that Plaintiff's treatment was not "'so woefully inadequate as to amount to no treatment at all,'" Defendants Brostoski and Brand are entitled summary judgment on Plaintiff's Eighth Amendment claims. *Mitchell*, No. 13-5315, slip op. at 4-5 (quoting *Alspaugh*, 643 F.3d at 169).

Plaintiff claims that Defendant LaPlaunt acted with deliberate indifference to Plaintiff's medical needs when she removed the footrests from Plaintiff's wheelchair. Defendant LaPlaunt states that Plaintiff's footrests were removed in accordance with URF policy, which provides that inmates with nonpermanent wheelchair designation should have the footrests removed. Docket #45-5 at 2. This policy was adopted to protect against inmates using the footrests as weapons. *Id.* This policy meets a penological goal; Defendant LaPlaunt acted within the policy standards. Moreover, as noted above, because Plaintiff was able to lift his legs and propel himself in the wheelchair with his feet, a foot rest was not medically indicated. Therefore, Defendant

LaPlaunt did not act with deliberate indifference and is entitled to summary judgment on Plaintiff's Eighth Amendment claim.

Plaintiff claims that Defendant Thompson acted with deliberate indifference by placing Plaintiff in a living area with a large fan that blows cold air on Plaintiff, causing him pain, and by refusing to allow Plaintiff use of a wheelchair inside the unit. Defendant Thompson states he has no access to Plaintiff's medical records. Docket #45-10 at 3 of 4, ¶ 8. Defendant Thompson also states he explained to Plaintiff that he had been moved to the Echo Unit at URF West because Plaintiff was cleared to use a wheelchair only for distance and that the Echo Unit accommodates that usage. *Id.* at pp. 2-3, ¶¶ 5-6. In addition, as noted above, Plaintiff's medical record shows that he was medically able to ambulate short distances using a walker and was not required to use a wheelchair except for long distances. Therefore, there is no genuine issue of material fact that Defendant Thompson acted with deliberate indifference to Plaintiff's medical needs. Defendant Thompson is entitled to summary judgment on Plaintiff's Eighth Amendment claim.

Plaintiff claims that Defendant Ball failed to treat his toe and conspired with Defendant Nurse Unknown Party #1 to deny Plaintiff treatment for his toe on February 1, 2012. In her affidavit, Defendant Ball denies evaluating or treating Plaintiff on February 1, 2012, and asserts that R.N. Danya Fischer treated Plaintiff on that date. Docket #45-16, p. 2. Defendant Ball further attests that she did not conspire to deny Plaintiff treatment for the toe. *Id.* There is no record that Plaintiff requested medical care for his toe injury, and medical records show Plaintiff was not seen by Defendant Ball on February 1, 2012. Docket #40-2, pp. 16-17, the date Plaintiff alleges he injured his toe. Docket #40-2, pp. 16-17. Plaintiff fails to allege any specific facts in support of his claims against Defendant Ball and in response to the motion for summary judgment. Therefore, Defendant Ball is entitled to summary judgment on Plaintiff's Eighth Amendment claim.

Plaintiff claims that Defendant Ward acted with excessive force by closing Plaintiff's cell door which hit Plaintiff's elbow.  Not "every malevolent touch by a prison guard gives rise to a[n Eighth Amendment] cause of action." *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992). However, significant injury is not a threshold requirement for an excessive force claim. *Wilkins v. Gaddy*, 130 S. Ct. 1175, 1178 (2010).  Instead, the "'core judicial inquiry' [is not] the extent of the injury," but "whether [the force used] was nontrivial and "was applied . . . maliciously and sadistically to cause harm.'" *Id.* at 1179 (quoting *Hudson*, 503 U.S. at 7).  As a result, an excessive force claim should not be dismissed on the basis that the Plaintiff's injuries were *de minimis*."  *Id.* at 1179.

Plaintiff claims that Defendant Ward subjected him to excessive force in violation of the Eighth Amendment. The Eighth Amendment embodies a constitutional limitation on the power of the states to punish those convicted of a crime.  Punishment may not be "barbarous" nor may it contravene society's "evolving standards of decency." *See Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981); *Trop v. Dulles*, 356 U.S. 86, 101 (1958).  The Eighth Amendment also prohibits conditions of confinement which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain." *Rhodes*, 452 U.S. at 346.  Among unnecessary and wanton infliction of pain are those that are "totally without penological justification."  *Id.*

The Supreme Court has held that "whenever guards use force to keep order," the standards enunciated in *Whitley*, 475 U.S. 312, should be applied. *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *see also Wilkins v. Gaddy*, 130 S. Ct. 1175, 1178-79 (2010).  Under *Whitley*, the core judicial inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6-7; *Wilkins*, 130 S. Ct. at 1178. In determining whether the use of force is wanton and unnecessary, the court should evaluate the need for application of force, the relationship between that need and the amount of force used, the

23

threat "reasonably perceived by the responsible officials," and any efforts made to temper the severity of the forceful response. *Hudson*, 503 U.S. at 6-7 (citing *Whitley*, 475 U.S. at 321); *accord Griffin v. Hardrick*, 604 F.3d 949, 953-54 (6th Cir. 2010); *McHenry v. Chadwick*, 896 F.2d 184 (6th Cir. 1990). Physical restraints are constitutionally permissible where there is penological justification for their use. *Rhodes*, 452 U.S. at 346; *Jones v. Toombs*, No. 95-1395, 1996 WL 67750, at *1 (6th Cir. Feb. 15, 1996); *Hayes v. Toombs*, No. 91-890, 1994 WL 28606, at * 1 (6th Cir. Feb. 1, 1994); *Rivers v. Pitcher*, No. 95-1167, 1995 WL 603313, at *2 (6th Cir. Oct. 12, 1995).

In *Wilkins v. Gaddy*, 130 S. Ct. 1175, 1178-79 (2010), the Supreme Court emphasized that *Hudson v. McMillian*, 503 U.S. 1, 4 (1992), held that the fact that an inmate's injuries were "de minimis" is not itself a bar to an Eighth Amendment claim. The seriousness of the injury is not a threshold inquiry. *Wilkins*, 130 S. Ct. at 1178 (quoting *Hudson*, 503 U.S. at 7). "The 'core judicial inquiry,' we held, was not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id.* (quoting *Hudson*, 503 U.S. at 7). "'When prison officials maliciously and sadistically use force to cause harm," the Court recognized, 'contemporary standards of decency always are violated . . . whether or not significant injury is evident.'" *Id.* Nevertheless, the absence of serious injury is relevant as a factor in determining whether the use of force plausibly could have been thought necessary to the situation. *Id.*

Plaintiff alleges that Defendant Ward intentionally slammed Plaintiff's cell door closed, which then struck Plaintiff in the elbow causing him pain. Plaintiff filed grievance URF-11-08-0573-26z in response to this incident. Docket #38-1, pp. 17, 20. An investigation was conducted and multiple inmates were interviewed during the grievance investigation. The witnesses stated that they had witnessed Defendant Ward using profanity and/or saw Defendant Ward slam Plaintiff's cell

24

door closed, hitting Plaintiff's elbow.  Docket #38-1, p. 23.  The investigating officer concluded he

could not substantiate whether Defendant Ward slammed the door, despite witness statements.  *Id.*,

pp. 23-25.  Plaintiff properly appealed, filing both a Step II and Step III grievance appeal.  The

appeals were denied at both steps finding that allegations were thoroughly investigated at Step I.  *Id.*,

pp. 13-16.

       In her affidavit, Defendant Ward attests that on July 25, 2011, there was a medical

emergency in Plaintiff's unit.  Defendant Ward informed all inmates to return to their cells and shut

their doors.  Defendant Ward walked by Plaintiff's cell and pulled the handle on his door.  Plaintiff's

door was already shut at the time.  Defendant Ward denies ever being contacted by the state police.

Docket #45-2, p. 3, ¶ 6.

       A review of Plaintiff's medical records shows that he was seen by Dr. Vindhya S.

Jayawardena, M.D. on July 25, 2011, for complaints of "ELBOW INJURY" and "SHOULDER

PAIN."  Docket #40-1, pp. 8-9.  Dr. Jayawardena noted, "INMATE STATES THAT [RESIDENT

UNIT MANAGER] SLAMMED THE DOOR AGAINST MY ELBOW AT 12:30 PM AND MY

ELBOW IS HURTING.  ALSO COMPLAINS THAT HE HAS PPRIOR [SIC] ROTATOR CUFF

SURGERY X3 AND HE HAS PAIN."  *Id.*  Dr. Jayawardena conducted a physical examination and

noted that Plaintiff's right elbow showed no swelling and had full range of motion.  *Id.*

       Plaintiff fails to allege facts that support an excessive force claim against Defendant

Ward.  The alleged act occurred for a penological purpose during a lock down and was not done

maliciously and sadistically to cause harm.  In addition, the fact that there was no discernible

swelling to Plaintiff's elbow and that his range of motion was normal supports Defendant Ward's

version of the events.  Therefore, Defendant Ward's motion for summary judgment on the excessive

force claim should be granted.

Moreover, 42 U.S.C. § 1997e(e) precludes any claim by a prisoner "for mental or emotional injury suffered while in custody without a prior showing of physical injury." The Sixth Circuit repeatedly has held that Eighth Amendment claims for monetary relief based on mental or emotional injury are precluded by § 1997e(e) absent a showing of physical injury. *See, e.g.*, *Harden-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008); *Merchant v. Hawk-Sawyer*, No. 01-6244, 2002 WL 927026, at *2 (6th Cir. May 7, 2002); *Garrison v. Walters*, No. 00-1662, 2001 WL 1006271, at *2 (6th Cir. Aug. 24, 2001); *Robinson v. Corrections Corp. of America*, No. 99-5741, 2001 WL 857204, at *1 (6th Cir. June 20, 2001); *Oliver v. Sundquist*, No. 00-6372, 2001 WL 669994, at *2 (6th Cir. June 7, 2001); *Williams v. Ollis*, Nos. 99-2168, 99-2234, 2000 WL 1434459 (6th Cir. Sept. 2000); *Raines-Bey v. Garber*, No. 99-1471, 2000 WL 658721, at *1 (6th Cir. May 12, 2000). Because the medical record shows that Plaintiff did not suffer a physical injury, he is not entitled to damages for Defendant Ward's alleged misconduct in slamming his door.

Plaintiff claims that Defendants Swift, Woods, and Osborn failed to protect Plaintiff from an assault by Plaintiff's cellmate. Inmates have a constitutionally protected right to personal safety grounded in the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Thus, prison staff are obliged "to take reasonable measures to guarantee the safety of the inmates" in their care. *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). To establish a violation of this right, Plaintiff must show that Defendant was deliberately indifferent to the Plaintiff's risk of injury. *Walker v. Norris*, 917 F.2d 1449, 1453 (6th Cir.1990); *McGhee v. Foltz*, 852 F.2d 876, 880-881 (6th Cir.1988). While a prisoner does not need to prove that he has been the victim of an actual attack to bring a personal safety claim, he must at least establish that he reasonably fears such an attack. *Thompson v. County of Medina, Ohio*, 29 F.3d 238, 242-43 (6th Cir.1994) (holding that plaintiff has the

minimal burden of "showing a sufficient inferential connection" between the alleged violation and

inmate violence to "justify a reasonable fear for personal safety.")

On February 20, 2012, Defendant Woods received a kite from Plaintiff indicating that

he wanted his cellmate moved due to incompatibility issues. Defendant Woods referred the matter

to Defendant Swift. Docket #45-6, p. 2, ¶ 4. In a memorandum dated February 22, 2012, to

Defendant Woods, Defendant Swift stated:

> [Plaintiff] was called out on 2/22/12. He indicated that he wants his
> Bunkie moved to another cell because they are not compatible.
> Specifically, the other prisoner is not clean enough in [Plaintiff]'s
> opinion and the two have different ideas of what is deemed
> comfortable regarding cell temperature.
>
> According to [Resident Unit Officer] Osborn the cell is not unusually
> dirty. [Plaintiff] is in a wheelchair and it is difficult to move him as
> it required moving another wheelchair prisoner as well. The other
> prisoner has not requested a move and according to [Plaintiff] the
> other prisoner does not wish to move.
>
> It was explained to Plaintiff that it is his responsibility to get along
> with his Bunkie and that we will not move one prisoner at another
> prisoner's request. That said, he was also told that if at any time he
> feels he is in danger of being harmed then he should convey that to
> staff immediately. He responded that he does not require protection
> and would like to just forget about the request to move.
>
> Note: should a wheelchair bed open in the future we will consider
> moving [Plaintiff] to the open bunk.

Docket #45-19, p. 2.

Plaintiff never alerted Defendant Osborn, the Corrections Officer who was

responsible for transfers within the unit, that he felt threatened by his cellmate. Nor did Plaintiff ever

request protection. Docket #45-8, p. 3, ¶¶ 6-7. On March 13, 2012, Corrections Officer Adam

Bernhardt was asked to speak with Plaintiff regarding a phone call from his attorney, who reported

that Plaintiff had been assaulted by his cellmate Billy Brandow #217823. Plaintiff asserted that

27

inmate Brandow had struck him on the side of his knee a few days earlier.  However, Plaintiff conceded that he did not have any marks or injuries as a result of the assault, nor did Plaintiff report the assault to any URF staff member.  Corrections Officer Bernhardt reported the incident and inmate Brandow was moved as a precautionary measure.  Docket #45-9, p. 3, ¶¶ 4-6.

As noted above, the record in this case shows that Defendants were not aware of any risk that Plaintiff's cellmate would become violent with Plaintiff prior to the alleged attack. Therefore, Defendants were not deliberately indifferent to any risk of injury to Plaintiff.  Defendants Swift, Woods, and Osborn are entitled to summary judgment on this claim.

Plaintiff claims that Defendants Filuppa, Wade, Hodges, and Konieczki acted in a retaliatory manner in violation of Plaintiff's First Amendment rights.  Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution.  *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).  In order to set forth a First Amendment retaliation claim, a plaintiff must establish that:  (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct.  *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The filing of a prison grievance is constitutionally protected conduct for which a prisoner cannot be subjected to retaliation. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001); *Hall*

*v. Nusholtz*, No. 99-2442, 2000 WL 1679458, at *2 (6th Cir. Nov. 1, 2000); *Burton v. Rowley*, No. 00-1144, 2000 WL 1679463, at *2 (6th Cir. Nov. 1, 2000).

Plaintiff claims that Defendant Konieczki retaliated against Plaintiff by having him transferred to another facility and by failing to ensure Plaintiff's medical information was listed on the appropriate transfer detail prior to Plaintiff's transfer to URF.  In Defendant Konieczki's affidavit, he attests that he "was not a member of the facility's Security Classification Committee during the time of the alleged occurrences, and had no involvement with the Plaintiff's transfer." Docket #45-14, p. 3, ¶ 5.  Defendant Konieczki further states he did not have access to Plaintiff's medical files and was not informed about pending medical opinions for Plaintiff prior to Plaintiff's transfer.  *Id.*  Plaintiff fails to allege any specific facts showing that Defendant Konieczki was involved in Plaintiff's transfer to URF or that Defendant Konieczki had any authority or ability to influence such a transfer.  Because there is no genuine issue of material fact that Defendant Konieczki took an adverse action against Plaintiff, he is entitled to summary judgment on Plaintiff's retaliation claim.

Plaintiff claims that Defendant Filuppa retaliated against Plaintiff through verbal harassment and yelling obscenities after Defendant Jones was reassigned to another unit for abusing Plaintiff.  However, Plaintiff fails to allege any specific facts regarding Defendant Filuppa's conduct. A specific threat of harm may satisfy the adverse-action requirement of a retaliation claim if it would deter a person of ordinary firmness from exercising his or her First Amendment rights, *see, e.g., Thaddeus-X*, 175 F.3d at 396, 398 (threat of physical harm); *Smith v. Yarrow*, 78 F. Appx 529, 542 (6th Cir. 2003) (threat to change drug test results).  However, certain threats or deprivations are so *de minimis* that they do not rise to the level of being constitutional violations.  *Thaddeus-X*, 175 F.3d at 398; *Smith*, 78 F. Appx at 542.  Mere verbal harassment, such as yelling obscenities, does not

amount to evidence of adverse action sufficient to establish a First Amendment retaliation claim. *Reeves v. Jensen*, 2007 WL 1464260, *5 n. 5 (W.D. Mich. May 17, 2007) (*citing Naucke v. City of Park Hills*, 284 F.3d 923, 928 (8th Cir. 2002)). Therefore, Defendant Filuppa is entitled to summary judgment on Plaintiff's retaliation claim.

Plaintiff claims that Defendant Ward retaliated against Plaintiff by changing the value of a disbursement claim and that Defendants Howard, Fears and Hodges, also in retaliation, submitted false statements during the investigation of grievance RRF-11-08-0674-28d regarding the disbursement. Evidence provided shows that the dollar amount on the disbursement form was changed. Docket #38-2, p. 24. Defendants Ward and Hodges deny submitting false statements or altering the disbursement forms in their affidavits. Docket ##45-2, p. 3; Docket #45-3, pp. 2-3. Defendant Hodges stated in her written statement during the grievance investigation that Plaintiff "made all of the changes to this form." Docket #38-2, p. 26. In the grievance investigation, Ms. Cheryl Flanagan, the business office cashier who initiates the disbursement requests, stated that prisoners can notify her if there is a discrepancy with the debit and the amount requested. *Id.*, p. 23. Ms. Flanagan stated she did not receive anything from Plaintiff to indicate there was a discrepancy with the amount. *Id.*

Plaintiff fails to show that Defendant Ward took any adverse action against Plaintiff. As noted above, the evidence supports a conclusion that Plaintiff altered the disbursement request, especially in light of the fact that he made no effort to correct the amount of the disbursement with the business office at the time of the disbursement.

Furthermore, Plaintiff fails to allege any facts showing that Defendant Ward had any retaliatory intent. It is well recognized that "retaliation" is easy to allege and that it can seldom be demonstrated by direct evidence. *See Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005);

30

*Murphy v. Lane*, 833 F.2d 106, 108 (7th Cir. 1987); *Vega v. DeRobertis*, 598 F. Supp. 501, 506 (C.D.

Ill. 1984), *aff'd*, 774 F.2d 1167 (7th Cir. 1985). "[A]lleging merely the ultimate fact of retaliation

is insufficient." *Murphy*, 833 F.2d at 108. "[C]onclusory allegations of retaliatory motive

'unsupported by material facts will not be sufficient to state . . . a claim under § 1983.'" *Harbin-Bey*,

420 F.3d at 580 (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)); *see also*

*Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice."); *Skinner v. Bolden*, 89 F. App'x 579, 579-80 (6th Cir. 2004)

(without more, conclusory allegations of temporal proximity are not sufficient to show a retaliatory

motive). Plaintiff's retaliation claim against Defendant Ward is purely speculative and conclusory.

Therefore, Defendant Ward is entitled to summary judgment.

Plaintiff claims that Defendants Filuppa and Jones engaged in a conspiracy to retaliate

against Plaintiff. A civil conspiracy under § 1983 is "an agreement between two or more persons

to injure another by unlawful action.'" *See Hensley v. Gassman*, 693 F.3d 681, 695 (6th Cir. 2012)

(quoting *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985)). The plaintiff must show the

existence of a single plan, that the alleged coconspirator shared in the general conspiratorial

objective to deprive the plaintiff of a federal right, and that an overt action committed in furtherance

of the conspiracy caused an injury to the plaintiff. *Hensley*, 693 F.3d at 695; *Bazzi v. City of*

*Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011). Moreover, a plaintiff must plead a conspiracy with

particularity, as vague and conclusory allegations unsupported by material facts are insufficient.

*Twombly*, 550 U.S. at 565 (recognizing that allegations of conspiracy must be supported by

allegations of fact that support a "plausible suggestion of conspiracy," not merely a "possible" one);

*Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008); *Spadafore v. Gardner*, 330 F.3d 849, 854 (6th Cir.

2003); *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987). However, because there is no

genuine issue of material fact that Defendants Filuppa and Jones intended to retaliate against Plaintiff, his related conspiracy claims are properly dismissed.

Plaintiff alleges ADA violations against Defendants Thompson, Osborn, Woods, and Brostoski. Title II of the ADA provides:

> . . ."no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." § 12132 (2000 ed.). A "'qualified individual with a disability'" is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." § 12131(2). The Act defines "'public entity'" to include "any State or local government" and "any department, agency, . . . or other instrumentality of a State," § 12131(1). [The Supreme Court has] previously held that this term includes state prisons. *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).

*United States v. Georgia*, 546 U.S. 151, 153-54 (2006). Thus, to state a claim under the ADA, a plaintiff must show that he is "(1) disabled under the statute, (2) otherwise qualified for participation in the program, [services or activities], and (3) being excluded from participation in, denied the benefits of, or subjected to discrimination under[,] the program, [services, or activities] by reason of his disability." *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 453 (6th Cir. 2008).

The Supreme Court has held that Title II of the ADA applies to state prisons and inmates. *Penn. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210-12 (1998) (noting that the phrase "services, programs, or activities" in § 12132 includes recreational, medical, educational, and vocational prison programs). The proper defendant under a Title II claim is the public entity or an official acting in his official capacity. *Carten v. Kent State Univ.*, 282 F.3d 391, 396–97 (6th Cir.

2002). Therefore, Plaintiff's ADA claims against Defendants Thompson, Osborn, Woods, and Brostoski in their individual capacities are properly dismissed. However, as noted above, Plaintiff also sues these Defendants in their official capacities.

Plaintiff claims that Defendant Thompson violated ADA regulations by not ensuring that the handicap accessible shower was accessible by wheelchair. Defendant Thompson states that Plaintiff's unit is a handicap accessible unit for prisoners who were medically cleared to use their wheelchairs for distance only. Docket #45-10, p. 3, ¶¶ 6-7. Plaintiff admits that he was prescribed a walker for mobility. Docket #3, p. 10. Therefore, Plaintiff was supplied with appropriate accommodations and was not denied access to services for or because of his handicap. Defendant Thompson's motion for summary judgment on the ADA claims should be granted.

Plaintiff makes a conclusory assertion that Defendant Osborn violated ADA regulations by giving false information to staff that Plaintiff was medically cleared to be moved to the west side of URF. In his affidavit, Defendant Osborn denies giving any information to staff that caused Plaintiff's move, and also denies having any "control, authority, or role in the decisions that led to Plaintiff being moved to URF West." Docket #45-8, p. 3, ¶ 9. Plaintiff does not allege any specific facts supporting his assertion that Defendant Osborn was involved in Plaintiff's room reassignment. Moreover, as noted above, Plaintiff was medically granted use of his wheelchair for distance only at the time of his transfer. Plaintiff was moved to URF West to make room for prisoners who were permanently wheelchair bound. *Id.*, ¶ 8. Accordingly, Defendant Osborn's motion for summary judgment should be granted.

Plaintiff claims that Defendant Woods violated ADA regulations by not notifying the CFA director or designee about Plaintiff's medical priorities or details and that this "negligence has caused [Plaintiff] to be subjected to cruel and unusual punishment, violating fed, state handicap laws

33

and Pd Policy Inhumane Treatment." Docket #3, p. 24. However, the record shows that Defendant Woods' only involvement with Plaintiff was the receipt of a kite requesting a room change. Such conduct does not support a finding that Defendant Woods denied Plaintiff the opportunity to participate in or benefit from services, programs, or activities, or that he otherwise discriminated against Plaintiff because of Plaintiff's disability. Therefore, Defendant Woods' motion for summary judgment regarding the ADA claim is properly granted.

Plaintiff asserts that Defendant Ward improperly charged Plaintiff a co-pay for health care services without Plaintiff's consent in violation of Plaintiff's due process rights. To establish a procedural due process claim under § 1983, Plaintiff must establish three elements: (1) Plaintiff has a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, (2) Plaintiff was deprived of this protected interest within the meaning of the Due Process Clause, and (3) the state did not afford Plaintiff adequate procedural rights prior to depriving him of his protected interest. *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999).

Plaintiff claims that he was charged a $5.00 co-pay for health care services after an administrative hearing was held at which Plaintiff was not present. In her affidavit, Defendant Ward attests that she held an administrative hearing on May, 27, 2010, regarding a co-pay owed by Plaintiff for a medical appointment. Plaintiff was present at the administrative hearing and claimed that he did not have to pay because he was a chronic care patient. During the hearing and in Plaintiff's presence, Defendant Ward contacted health care to determine Plaintiff's medical status. Health care staff informed Defendant Ward that Plaintiff was not a chronic care patient. Consequently, Defendant Ward ruled against Plaintiff and told him that he was responsible for paying the co-pay. Docket #45-2, pp. 2-3, ¶ 4. Plaintiff filed a grievance on this matter. In the

Step II appeal response, Laura Kinder, R.N., noted that the matter was investigated and the facility nursing supervisor had indicated that the reason for Plaintiff's visit to health care on April 15, 2010, was not for chronic care, but was a billable visit. Docket #38-2, pp. 47, 50.

In the opinion of the undersigned, Plaintiff received due process of law. Plaintiff concedes that he received notice of the hearing on the date that it was held. Defendant Ward attests that Plaintiff attended the hearing. An investigation discovered evidence showing that Plaintiff was properly charged a co-pay. Accordingly, Plaintiff received due process prior to the deprivation of his property. Defendant Ward is entitled to summary judgment with regard to Plaintiff's due process claim.

Plaintiff claims that Defendant Covert violated his due process rights when he prevented a grievance from being processed. Plaintiff has no due process right to file a prison grievance. The Sixth Circuit and other circuit courts have held that there is no constitutionally protected due process right to an effective prison grievance procedure. *Walker v. Mich. Dep't of Corr.,* 128 F. App'x 441, 445 (6th Cir. 2005); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003); *Young v. Gundy,* 30 F. App'x 568, 569-70 (6th Cir. 2002); *Carpenter v. Wilkinson,* No. 99-3562, 2000 WL 190054, at *2 (6th Cir. Feb. 7, 2000); *see also Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996); *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). Michigan law does not create a liberty interest in the grievance procedure. *See Olim v. Wakinekona,* 461 U.S. 238, 249 (1983); *Keenan v. Marker*, 23 F. App'x 405, 407 (6th Cir. 2001); *Wynn v. Wolf*, No. 93-2411, 1994 WL 105907, at *1 (6th Cir. Mar. 28, 1994). Because Plaintiff has no liberty interest in the grievance process, Defendant Covert's conduct did not deprive him of due process.

Defendant Lamb moves for dismissal for lack of personal involvement because although Plaintiff lists Defendant Lamb as a defendant, he fails to accuse her of any wrongdoing.

35

Liability under Section 1983 must be based on more than merely the right to control employees. *Polk Co. v. Dodson*, 454 U.S. 312, 325-26 (1981); *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978).  Thus, Section 1983 liability cannot be premised upon mere allegations of *respondeat superior*.  *Monell*, 436 U.S. at 691; *Polk*, 454 U.S. at 325.  A party cannot be held liable under Section 1983 absent a showing that the party personally participated in, or otherwise authorized, approved or knowingly acquiesced in, the allegedly unconstitutional conduct. *See e.g. Leach v. Shelby Co. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989), *cert. denied*, 495 U.S. 932 (1990); *Hays v. Jefferson*, 668 F.2d 869, 874 (6th Cir.), *cert. denied*, 459 U.S. 833 (1982).  *See also Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.), *cert. denied* 469 U.S. 845 (1984).

Supervisory officials can be held liable for the acts of their subordinates only if plaintiff establishes that the supervisor failed to appropriately discharge his supervisory duties, and that this failure resulted in a denial or deprivation of plaintiff's federal rights.  *See e.g. Leach*, 891 F.2d at 1246; *Hayes v. Vessey*, 777 F.2d 1149, 1154 (6th Cir. 1985).  However, the failure of a supervisor to supervise, control or train the offending employee is not actionable absent a showing that the official implicitly encouraged, authorized, approved or knowingly acquiesced in, or in some other way directly participated in, the offensive conduct.  *Leach*, 891 F.2d at 1246.  Such a claim requires, at a minimum, that the official had knowledge of the offending employee's conduct at a time when the conduct could be prevented, or that such conduct was otherwise foreseeable or predictable.  *See e.g. Gibson v. Foltz*, 963 F.2d 851, 854 (6th Cir. 1992).  In addition, plaintiff must show that defendant had some duty or authority to act.  *See e.g. Birrell v. Brown*, 867 F.2d 956, 959 (6th Cir. 1989) (lower level official not liable for shortcomings of building); *Ghandi v. Police Dept. of City of Detroit*, 747 F.2d 338, 351 (6th Cir. 1984) (mere presence at the scene is insufficient grounds to impose Section 1983 liability in the absence of a duty to act); *accord Hall v. Shipley*, 932

F.2d 1147 (6th Cir. 1991). In addition, merely bringing a problem to the attention of a supervisory official is not sufficient to impose such liability. *See Shelly v. Johnson*, 684 F. Supp. 941, 946 (W.D. Mich. 1987) (Hillman, C.J.), *aff'd* 849 F.2d 228 (6th Cir. 1988). Finally, supervisory liability claims cannot be based on simple negligence. *Leach*, 891 F.2d at 1246; *Weaver v. Toombs*, 756 F. Supp. 335, 337 (W.D. Mich. 1989), *aff'd* 915 F.2d 1574 (6th Cir. 1990).

Plaintiff has not alleged facts establishing that Defendant Lamb was personally involved in the activity which forms the basis of his claim. Accordingly, Plaintiff's claims against Defendant Lamb are properly dismissed for lack of personal involvement.

Defendants Ward, Filuppa, Hodges, Konieczki, Lamb, Woods, Ball, Osborn, Swift, Thompson, LaPlaunt, and Covert alternatively move for dismissal based on qualified immunity. Government officials, performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An "objective reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful. *Dietrich*, 167 F.3d at 1012; *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). "Qualified immunity balances two important interests–the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 129 S. Ct. 808, 815 (2009).

In making a qualified immunity determination the court must decide whether the facts as alleged or shown make out a constitutional violation or whether the right that was allegedly violated was a clearly established right at the time of the alleged misconduct. *Id.* at 816. If the court

37

can conclude that either no constitutional violation occurred or that the right was not clearly established, qualified immunity is warranted. The court may consider either approach without regard to sequence. *Id.* As previously discussed, because Plaintiff cannot establish that his constitutional rights were violated, Defendants Ward, Filuppa, Hodges, Konieczki, Lamb, Woods, Ball, Swift, Thompson, LaPlaunt, and Covert are entitled to qualified immunity.

To the extent that Plaintiff is claiming his state law rights were violated, it is recommended that this court refuse to exercise pendent jurisdiction over such claims. Claims raising issues of state law are best left to determination by the state courts, particularly in the area of prison administration. In addition, pendent jurisdiction over state law claims cannot be exercised after all federal claims have been dismissed. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726-7, 86 S. Ct. 1130, 1139 (1966); *Moon v. Harrison Piping Supply, et al.*, 465 F.3d 719 (6th Cir. Sep. 28, 2006); *Smith v. Freland*, 954 F.2d 343, 348 (6th Cir.), *cert. denied*, 504 U.S. 915, 112 S.Ct. 1954 (1992).

> That power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them, *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L. Ed. 1188. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well. Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals.

*United Mine Workers v. Gibbs*, 383 U.S. 715, 726-727, 86 S. Ct. 1130, 1139 (1966).

For the foregoing reasons, I recommend that the motions for summary judgment filed by Defendants Brand, Brostoski, Ball, Covert, Filuppa, Hodges, Konieczki, LaPlaunt, Lamb, Osborn, Swift, Thompson, Ward and Woods (docket #37 and #44) be granted and that this case be dismissed in its entirety.[2]

Should the court adopt the report and recommendation in this case, the court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3).  *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997).  For the same reasons that the undersigned recommends granting Defendants' motion for summary judgment, the undersigned discerns no good-faith basis for an appeal.  Should the court adopt the report and recommendation and should Plaintiff appeal this decision, the court will assess the $505 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g).  If he is barred, he will be required to pay the $505 appellate filing fee in one lump sum.

NOTICE TO PARTIES:  Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).

     /s/ Timothy P. Greeley                          
TIMOTHY P. GREELEY
UNITED STATES MAGISTRATE JUDGE

Dated:  August 4, 2014

---

[2]Because Defendants Fears, Haynie, Howard, Jones and Wade were never served, they are not proper parties to this case.